**Richard E. Bergeron III**
**PO Box 5212**
**Weirs Beach, NH 03247**
**Pro-Se**
**Email: Rich.Bergeron@gmail.com**
**617-209-4325**

RECEIVED & FILED
FEB 28 11 49 AM '11
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| **In re:** | ) | **Case No: BK-S-08-10474-MKN** |
| | ) | **Chapter 11** |
| **XYIENCE, INCORPORATED,** | ) | |
| **A Nevada Corporation,** | ) | |
| | ) | **Adversary No. 08-1082-MKN** |
| **Debtor.** | ) | |
| | ) | |
| | ) | |
| **XYIENCE, INCORPORATED,** | ) | |
| **A Nevada Corporation,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD BERGERON, an individual,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | **OPPOSITION OF** |
| **RICHARD BERGERON, an individual,** | ) | **DEFENDANT AND** |
| | ) | **COUNTERCLAIMANT** |
| **Counterclaimant,** | ) | **RICHARD E. BERGERON** |
| | ) | **TO COUNTERDEFENDANT** |
| **v.** | ) | **FERTITTA ENTERPRISES'** |
| | ) | **EMERGENCY MOTION FOR** |
| **XYIENCE INCORPORATED, a Nevada** | ) | **PLAN IMPLEMENTATION** |
| | ) | **INJUNCTION** |
| **corporation,** | ) | |
| | ) | **Hearing Date: March 1, 2011** |
| **Counterdefendant.** | ) | **Time: 11:00 AM** |
| | ) | |

# OPPOSITION OF DEFENDANT AND COUNTERCLAIMANT RICHARD E. BERGERON TO COUNTERDEFENDANT FERTITTA ENTERPRISES' EMERGENCY MOTION FOR PLAN IMPLEMENTATION INJUNCTION

***"I think if this case does nothing else, perhaps it will bring into focus that again we are in that moment of history when a courtroom becomes the proving ground of whether we do live free and whether we do die free. You are in that position now. Suddenly all importance has shifted to you—shifted to you as I guess in the last analysis it should go, and it is really your responsibility, I think, to see that men remain able to think, to speak boldly and unafraid, to be masters of their souls, and to live and die free."***

***"To use these problems by attempting to destroy those who protest against them is probably the most indecent thing that we can do. You can crucify Jesus, you can poison a Socrates, you can hang John Brown or Nathan Hale, you can kill a Che Guevara, you can jail a Eugene Debs or a Bobby Seale. You can assassinate John F. Kennedy or a Martin Luther King, but the problem remains. The solutions are essentially made by continuing and perpetuating with every breath you have the right of men to think, the right of men to speak boldly and unafraid, the right to be masters of their souls, the right to live free and die free. The hangman's rope never solved a single problem except that of one man."***

***Closing Argument by William M. Kuntsler in The State of Illinois v. Abbie Hoffman, et al.*, Chicago, Illinois, February, 1970.**

## INTRODUCTION

Defendant and Counterclaimant Richard E. Bergeron ("Bergeron") hereby files this opposition to the Fertitta Enterprises' Emergency Motion For Plan Implementation filed on February 24, 2011. Bergeron brings this opposition as a pro-se representative in these proceedings. As such, he requests the court take note of the following:

***Traguth v. Zuck*, 710 F. 2d 90, 91 (1983):**

**"Implicit in the right to [self-representation] is the obligation on the part of the Court to make reasonable allowances to protect Pro Se litigants from inadvertent forfeiture of important rights because of their lack of legal training." And the "Court's duty is even broader in the case of a [Pro Se] defendant who finds [himself] in court against [his] will with little time to learn the intricacies of civil procedure and law." See 28 U.S.C.A. 1654.**

Fertitta Enterprises, through their counsel Gregory E. Garman, brings this motion without any due authority or jurisdiction to make such an over-reaching and overbroad request for injunctive relief. Attorney Garman represents Zyen, LLC and Manzen, LLC and not the liquidation trust. This is simply another example of an abuse of process

perpetrated at the behest of Fertitta Enterprises representatives who seek to silence Bergeron's true and accurate reporting of what is an ongoing scandal involving bankruptcy fraud, money laundering, insider dealing, and an orchestrated bleed out of the newly organized company under Zyen, LLC management.

The motion in question was obviously assembled in haste and without adequate research into the actual legal circumstances surrounding these proceedings. Several blatant and inherently sloppy mistakes can be found in the initial motion and supporting documents. For one, Bergeron is being blamed for communicating with Frank Fertitta, Jr. and asked to refrain from doing so despite the fact that Mr. Fertitta is deceased. Bergeron has no capacity to communicate with the dead, and Mr. Garman should be well aware that Mr. Fertitta is no longer among the living. Furthermore, Bergeron never once contacted or sought to contact Frank Fertitta, Jr. even while Mr. Fertitta was alive.

Secondly, the injunction cited by Garman in the motion is clearly contrary to his contentions that Bergeron should not be allowed to proceed with his sanctions request. As cited in the oppositions to Bergeron's latest motion to again amend the yet to be heard first amended sanctions motion, Bergeron first sought sanctions before said injunction was confirmed along with the plan of reorganization containing that injunction (The plan containing the injunction was confirmed on October 23, 2008). As such, the language in the injunction allowing only for the shareholder derivative action and the "Bergeron matter" to continue encompasses the sanctions claim as allowable to continue and be prosecuted by Bergeron as part of these proceedings. This situation makes Garman's request to enjoin Bergeron from pursuit of the Rule 9011 motion claims entirely moot. He simply has no authority to make such a request.

Thirdly, Garman's motion argues that the liquidation trust has the lone ability to bring this type of "litigation claim" when the sanctions request is both insulated by the existing injunction and is in fact not a traditional "claim" at all. Bergeron recently inquired with Trustee Counsel Jon Backman as to whether it would be legally permissible or even arguable under the law for the liquidation trustee to take over "Real Party in Interest" in Bergeron's sanctions motion. Attorney Jon Backman has

yet to provide any answer to that inquiry, though he maintains he would not be interested in taking such action. A Rule 9011 motion for sanctions is not a complaint-based litigation claim that could ever result in trial. Although it does absorb the tort of abuse of process in the bankruptcy courts, Rule 9011 is a motion-based arm of potential relief which is designed to be adjudicated after an evidentiary hearing in which all parties sanctions are sought against can give testimony and be subject to cross-examination. No such hearing has been held, though the matter was deemed submitted (by order of Judge Nakagawa) on March 26, 2009.

Another error in the emergency motion is Garman's uneducated and ignorant assumption that the $500,000 Bergeron is requesting in personal relief in the 9011 motion is for legal fees. Bergeron stated in open court, in the presence of Garman, on February 10th, 2011 that the relief he requests is for work hours lost, the frustration and aggravation associated with being forced to respond to frivolous claims, and the general distraction caused by a case which was brought specifically to silence his reporting and unduly damage his reputation as a journalist. Bergeron has always been aware that pro-se representatives are not permitted to request payment of legal fees of any kind. Garman has a responsibility as a representative of his clients to know the facts of this case, but he clearly has not done his homework in respect to the aforementioned matters.

Garman also cites another section of the confirmed reorganization plan in his emergency motion, which follows in its entirety:

> From and after the Effective Date, the Debtor, . . . the Professionals nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys or agents, shall have or incur any liability to any holder of a Claim or Equity Interest or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward), the Bankruptcy Case, Liquidating Trust, the pursuit of confirmation of this Plan or the consummation of this Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan or in the context of the Case.

Id. § 8.5.

Also addressed at the last hearing on amendment and within the associated

paperwork for that motion, the key words in that passage that apply to Bergeron's claims are: "…except for gross negligence and willful misconduct." It has never been Bergeron's contention that the sanction-worthy transgressions were anything less than negligent and willful acts designed to damage shareholders who were left in the dark after Bergeron was targeted by the frivolous and maliciously motivated district court injunction in March of 2007.

Since the entry of that injunction, Bergeron has willfully and deliberately violated the language of that district court injunction order and subsequently begged that court and the bankruptcy court to sanction him for it. Both courts refused to do so, and Bergeron's opposition has thus far neglected to file any motion formally requesting he be sanctioned for such willful violations. The other proceedings in which Bergeron has been sanctioned were the unfortunate result of an injunctive ruling made by a heavily-biased federal judge with a position on the board of directors for a health care conglomerate the plaintiff in that case currently pays his professional medical practice insurance fees to and his facility rent to. Bergeron also appealed those sanctions orders to the 7th Circuit Court of Appeals, and there has been no determination by that court as of yet on those respective appeals matters.

Attorney Garman has made repeated requests of this court for Mr. Bergeron to be required to pay attorney fees for his client's responsive pleadings and associated appearances and other legal work involved in the pending matters. Neither Judge Nakagawa nor Judge King have obliged Garman thus far. Garman has additionally never filed his own formal sanctions motion or any other formal request for injunction-related contempt to this point other than those pleas for relief associated with the instant motion. There is no basis for further injunctive relief under the circumstances, and if there were it would only be available as a resort for the liquidation trust to pursue under the current stipulations of the reorganization plan approved in October of 2008. These facts would therefore support an additional basis for further sanctions to be applied against Garman and his respective clients named in the sanctions motion for the frivolous nature of the instant motion and the improper couching of such a motion as an "emergency."

The allegations of Attorney Garman against Bergeron are plainly and easily discredited by his own lack of due diligence in seeking any formal legal relief (either inside or outside the bankruptcy process) for what he perceives to be and describes as tort worthy or sanction worthy behavior. Garman claims that Bergeron's lack of success in prosecuting the previous dismissed claims was due to the frivolous nature of such claims. Yet, Garman never filed his own formal sanctions request and has shown no intent to do so in the future. Garman has also made repeated overtures about the published work of Bergeron relating to his clients being unfounded and/or untrue. Yet, none of Garman's clients have ever sought any outside legal relief whatsoever for defamation or any other tort related to Bergeron's published writing since the filing of the case against Bergeron by Xyience, Incorporated in March of 2007. None of the injunctive language cited prevents Garman's clients from seeking such relief in outside courts if indeed they were ever entitled to it.

The instant motion is simply a ploy to silence Bergeron's reporting and halt what has been some of the most effective work done by Bergeron to date, work which is designed to ferret out the truth behind the ongoing corruption within the reorganized Xyience. Furthermore, there is no basis or jurisdictional nexus for injunctive relief under the auspices of the current proceedings for Bergeron's investigative endeavors targeted at the newly formed Xyience and not the bankruptcy estate itself. Such journalistic pursuits of the truth are furthermore protected by the First Amendment and are not related in any way to interfering or attempting to interfere with any section of the stipulated language of the confirmed plan of reorganization. Injunctive relief under these circumstances would represent a prior restraint against future speech and communication, which is unconstitutional under the conditions described in Garman's motion. All allegations of wrongdoing cited on page 7 of the instant motion and labeled (I) through (Vii)--and all subsequent allegations and descriptions of such that follow and precede those sections of the instant motion--are outside the scope of the bankruptcy court's authority to address on behalf of Garman and his clients. The proper venue for Garman and his clients to seek relief under these circumstances would be through filing an entirely new civil action brought by Zyen, LLC (and/or other

associated entities) encompassing the alleged torts of harassment, defamation, and other potential torts that could possibly apply to such accusations.

Bergeron's attempts to inspire settlement of the yet to be heard amended 9011 sanctions motion are by no means an attempt to extort any party. While many other law firms routinely and effectively use private investigators to assist with complex cases, Bergeron is his own investigator. As such, his actions to both expose the truth behind the day to day operations of the reformulated Xyience and to facilitate a settlement for himself and the shareholders should not be considered extortionist. These are earnest attempts to confront the opposition with the truth and the evidence that is mounting with each and every day and will only lead to further harm to the opposition (albeit justifiable harm) the longer they avoid coming to terms with their respective transgressions. Whether these parties settle or not, their fierce resistance to accepting culpability and responsibility for their egregious actions will only serve to further injure the reputation of said parties when a wide scale creative project by way of a book and/or screenplay reaches the mass market. Bergeron is currently in talks with film producers, book publishers, agents and financiers to facilitate such creative projects.

Forcing Bergeron to cease and desist contacting current or past Xyience employees and any other party or parties involved in his investigation and the resulting creative works he is actively producing would unduly interfere with his freedom of speech and his ability to accurately portray this compelling true story from the perspective of the individuals who actually witness(ed) the ongoing wrongdoing. Further, Garman's requests cannot be seen as anything less than overbroad and vague due to his neglecting to specifically name all the parties Bergeron should be restrained from contacting. This scenario as it currently stands and has been described by Garman would only justify Bergeron being enjoined from contacting those who have obtained formal protective orders against him. Thus far only Garman himself and current Xyience Employee John Villari have sought such protective measures, though Bergeron has yet to be served with these orders and only is aware of them from his reading of the instant motion. Whistleblower protections insulate current and past employees of Xyience from retaliation for exposing corruption where they work, and it

is their right to speak to or communicate otherwise with Bergeron if they should choose to do so. It is also Bergeron's right to contact them with questions and concerns relating to his ongoing journalistic endeavors.

The truth is, Bergeron already communicates with cultivated sources within the current Xyience offices. These sources tell him that the bulk of the staff members at the company actually approve of Bergeron's work. Some of these non-source employees have even indicated to his sources that they would personally provide Bergeron with inside information if it would not put their employment in jeopardy. Executives at Xyience including President and CEO John Lennon, COO and CFO Michael Levy, and Fertitta Enterprises and Zyen, LLC General Manager Bill Bullard have each made formal statements to collective and individual employees discouraging them from speaking to Bergeron. Even after these terse warnings, Bergeron's sources are still actively providing him information and evidence regarding the day to day operations of the company and the associated corruption that continues to presently damage the company while simultaneously providing undue benefit to particular insiders.

The details Bergeron is actively learning from inside sources regarding company principals, policies, and procedures are also supplemented by other successful intelligence gathering methods. This includes the active use multiple tools and proven strategies private investigators rely on and some only those experienced in military intelligence operations routinely call upon. Harnessing all these avenues to gain knowledge of the interior operations of the company, Bergeron can effectively find out exactly how his approach is impacting those who are facilitating the ongoing corruption. Bergeron is also made aware of every formal meeting regarding his work, every major concern of company executives shared with employees regarding him, and every defamatory statement or spoken slander directed at his efforts.

As disturbing as it may be for certain culpable people to deal with Bergeron being intimately aware of certain sensitive details and/or corrupt behavior the company brass would rather he have no knowledge of, his actions to pursue his creative efforts are well within the bounds of investigative reporting. Though these actions have also yielded information and intelligence that will also help the legal case against his

opposition, this is no cause to provide injunctive relief that would simply prevent the honest truth from being revealed about a company being corrupted from within and with the blessing of the highest authorities in the corporation's chain of command and ownership ranks.

Since Bergeron is in a position where he has effectively infiltrated this company, the evidence he's collected and acquired is certainly enough to file a new civil action of his own in Nevada District Court against the company and certain executives like John Lennon. Among the potential tort claims Bergeron now plans to seek relief for are defamation and slander. Bergeron has evidence of multiple comments leveled at current employees through emails and formal meetings designed to discredit Bergeron by lying about his background, his motives, and the details of the instant case. Bergeron's ongoing cooperation with the liquidation trustee and his history of litigation and publication regarding Xyience support his true motive to simply weed out the corruption constantly plaguing this company so it can survive as an honest entity with clean hands operating it. Yet, Bergeron is repeatedly described as being only out to damage or destroy the company. Though it seems malicious for Bergeron to have a Web-site entitled XyienceSucks.Com, this is actually a common practice utilized to avoid trademark claims against such a site. After all, a company cannot easily claim a particular site is "confusingly similar" to any particular mark when the term "sucks" is added to a domain encompassing that mark.

In this scenario Bergeron is not essentially saying or claiming that Xyience the corporate entity sucks, rather he is implying that some of the people who are running it and corrupting its operations suck. Indeed, Bergeron is partnered with a sponsor of his Web-site network who operates an E-Bay store that actively sells Xyience products. This is an entirely legal business run by a person who believes in the product and the brand. This individual has an active working relationship with the corporation, and he routinely orders new product directly from the company for resale to his customers. Bergeron additionally regularly wears Xyience clothing, and when he visited Xyience offices in recent weeks he wore a Xyience baseball cap.

As a pro-se representative at the outset of these proceedings Bergeron was a true

fish out of water. Though he had respectable writing skills, legal writing was something he never attempted before. Since the filing of the frivolous $25 million case against him, Bergeron has grown tremendously as his own legal advocate. Still, the few advantages he maintains like the lack of overhead expenses incurred are by far outweighed by the advantages his opposition brings to the table. At the last hearing in these proceedings, Judge King admonished Bergeron for costing his opposition various legal fees. Yet, no advantage the opposing counsel enjoys was harped on or painted as unfair to Bergeron. For instance, to work on these proceedings Bergeron has had to give up countless hours of time better spent on more financially sound endeavors while opposing counsel rake in hourly legal fees for all their work on associated paperwork, research and appearances in court. His journalistic career has been interrupted and interfered with by having to become an overnight lawyer without any benefit of an hourly rate and few donations given to his effort by those he is seeking to help with his work. There is no reason for the court to focus so much on Bergeron's lack of overhead and consider it anything more than a reality of the circumstances. After all, it is not as if the very filing of the initial district court case and the subsequent legal paperwork filed against him did not serve in the beginning stages as a vastly unfair advantage held by the opposition at that time. Yet, Xyience was never admonished at the outset of this case by any judge for having lawyers capable of crafting vexatious and voluminous legal pleadings designed only to intimidate a person who was at the time wholly unprepared to adequately respond and compete.

The following quote is from the closing arguments of Robert H. Jackson at the Nuremberg War Crimes Trial on July 26, 1946:

> **"But again the defendants claim: 'To be sure, we were building guns. But not to shoot. They were only to give us weight in negotiating.' At its best this argument amounts to a contention that the military forces were intended for blackmail, not for battle."**

Punishing or exhibiting any bias against Bergeron for embracing his natural advantages as a pro-se attorney is simply uncalled for. He should not be forced to ease up on these advantages to let the opposition catch up when their current advantages should still outweigh his if they indeed have the facts on their side. The only reason Bergeron's low overhead advantage is so significant in the first place is because his

opposition has no facts to support their claims and contentions. All they bring to the table is misguided and irrelevant allegations of misconduct on Bergeron's part which this court has no authority to address under the current language of the reorganization plan.

The very manner in which Attorney Garman brought the instant motion on an order shortening time resulted in Bergeron having to forego efforts to remedy his current financial situation due to the expenses he incurred to attend the previous hearing. He cannot possibly spend time addressing his over-drafted bank account or afford to do work to pay for travel back to his home state while having to respond to such spurious requests from Garman on behalf of his long list of corrupt clients.

Judge King issued a verbal order in the previous hearing requiring Bergeron's personal attendance at all future hearings despite no inquiry as to how Bergeron was able to afford to attend that hearing. Bergeron's choice to attend personally was not an easy one. He made his pilgrimage only because he felt the need to personally lobby Judge Nakagawa for relief on behalf of the very shareholders who provided his travel expenses only after he spent day after day looking up phone numbers of former investors and explaining his situation and his needs to make a real, meaningful impression on the court. Judge King's substitution was a surprise to both Bergeron and Liquidation Trustee Counsel Jonathan Backman (who did not even realize King was presiding until well into the proceedings). Bergeron set the hearing date itself through Nakagawa's secretary, and the hearing was even held in Judge Nakagawa's courtroom. Judge King demonstrated an unhealthy disdain for Bergeron's efforts, which Judge Nakagawa obviously has a much better grasp of. King even admitted at one point in the prior hearing that he had not even read much of the pleadings the hearing itself was based on. Bergeron promised to appeal a ruling he saw as biased and improper due to these circumstances, a ruling which perhaps should have been issued only after the record was more fully reviewed by a judge who professed to be ignorant of cited statutes and precedents Bergeron attempted to call his attention to only to have them summarily ignored without hesitation.

Judge King also showed bias against Bergeron acting as his own attorney,

repeatedly insisting Bergeron and those he sought relief for acquire an attorney. This was despite Bergeron's earnest description of the circumstances and losses that investors sustained that made hiring any paid lawyer impossible. Also, when some of these shareholders did hire a lawyer the attorney did not bother to figure out he had to fight for the entire class to gain any relief. Later, Bergeron sought to obtain copies of the King order for appeal and found no order had been entered and the items which had been heard on February 10, 2011 had been mysteriously taken off calendar.

The situation Bergeron was left with after the prior hearing was one in which he knew there was no possible way he could return home as previously planned. He could simply not afford to travel to this venue for each hearing if he did go home, and requiring him to do so was akin to giving him an ultimatum: give up or win this case. Some soul searching gave way to a decision to win the case or work to make sure settlement was the only option. Since the February 10th, 2011 hearing Bergeron has worked tirelessly toward the end of exposing the fraud and corruption at the heart of this case through an aggressive campaign of investigation and publication. He has been given no other choice but to respond in this particular manner. There is a newfound urgency to his efforts thanks to Judge King's ruling, and since all executives he's requested formal interviews with refused, he has had to get his evidence the hard way.

The only reason Bergeron is being targeted with these frivolous and vexatious attempts to silence him now is because his investigation strategy produces regular, potent results. His campaign to find the truth has been much more effective than waiting for the courts to sort this matter out and promote justice. Without this arm of his defense being involved in some capacity from the outset, Bergeron would not have survived this far and would have simply been shut down and out by the courts he's struggled through over the last 4 years. Even if he cannot use the evidence he gathers in court, it can be used in print. Both forums can effectively put pressure on his opposition to realize that they can no longer hide the truth and will soon have to own up to their egregious and abusive actions to punish innocent people in order to pad their own bottom lines and bank accounts.

Executives at Xyience have characterized Bergeron's behavior in recent weeks as

some kind of misguided temper tantrum motivated by the court ruling against him on February 10th. Bill Bullard told employees Bergeron was simply "whining" when he handed them all stacks of paperwork last Friday upon the initiation of this instant motion. All employees of Xyience based at the Las Vegas headquarters were let go early on Friday after being corralled into a room devoid of any furniture and lectured by Bullard about the danger Bergeron posed to the company. A source who spoke to Bergeron after the meeting told him one particular employee asked aloud if he should be worried that Bergeron might attack him. Bullard stated definitively that Bergeron was no physical threat to any employee. Bullard added that he had dealt with Bergeron for years and knew he was not at all violent.

Unfortunately, justice sought after in the courts can take years. When the wheels of justice are asked to move in reverse, they all too often refuse to cooperate. It is a rigid system that is both imperfect and severely flawed, but this does not take away the fact that this is often the only way for people to gain relief from certain situations in which they have been brutally victimized. The person who refuses to even consider the system being too corrupt to work is ill-equipped in this day and age to fight a battle like this in a system such as this. Bergeron learned at an early age that even our most trusted government institutions have a funny way of pursuing and promoting "justice."

Bergeron's father was a lifelong police officer before retiring as a chief of police. His early days as a detective in the 1980s put him up against the likes of a notorious South Boston crime boss named Whitey Bulger. Bergeron's father investigated Bulger during a time when it was a closely held secret that this ruthless criminal was involved in the FBI's "Top-Echelon Informant Program" instituted by an agent (now in prison) who had been a childhood acquaintance of Bulger. During his informant days Bulger routinely paid bribes to FBI agents and other law enforcement officials to avoid prosecution for crimes up to and including murder. It wasn't until decades later that the truth about this corrupt arrangement were fully exposed. One of the most chilling realities to emerge from this situation left blood on Bergeron's father's hands.

A young man who worked on an IRA gun shipment for Bulger came into the police department after a domestic dispute one night. Bergeron's father, an expert in

organized crime, was brought in to interrogate this young man when he started offering to give up information on Bulger. This man confessed his sins and detailed the pangs of guilt he felt that made him want to get out of the life he'd been living and change the person he'd become. Bergeron's father knew the only place for such an informant to find refuge would be the witness protection program, so he called the FBI to report what he'd heard. Weeks later the informant disappeared. Long after Bulger's cover was blown and indictments came down, that young informant's body was dug up and his final hours were detailed for a court nearly 20 years after his death. Finally Bergeron's father discovered what carnage his one phone call executed in good faith resulted in. The informant he thought he was protecting by alerting the FBI was given up to Bulger by his handlers so he could be brutally murdered in a cold, dark South Boston basement. This man was first strangled with thick rope until he gave up what he'd confessed to Bergeron's father and other law enforcement officials. He then had his tongue ripped out with a pair of pliers before being shot in the head and put out of his misery.

This is the reality Bergeron grew up watching his father struggle with, and this troubled Bergeron to no end since he knew his father believed enough in his country to serve a tour of duty in Vietnam and a subsequent stint in the Army upon his return from battle. The experiences his father suffered due to his blind trust for the justice system have had a large impact on Bergeron's motivations in this case. He knows if he does not adequately account for every potential contingency and the worst possible conditions of corruption imaginable, he cannot hope to find justice in the current scenario.

It was a couple of Boston Globe reporters who first broke the Bulger informant story wide open, and Bergeron's father was forced to pay $8,000 in sanctions for leaking the transcript of his informant's first interview to those writers. The justice system finally cracked down on Bulger only after he fled the jurisdiction. Bulger is still on the FBI's top 10 most wanted list and remains a fugitive. The moral of the story is that courts of law and federal agencies are sometimes the last place where true justice is promoted. Often the courts are the last place one needs to go to seek real justice. Often the institutions we are taught to trust most are the ones we should trust the least. Often

the courts we think are designed to protect our rights and promote the truth do nothing but take away our rights and obscure the truth. Bergeron's own experience with the Justice system has shown him the courts can be a playground for the rich and powerful to pull off intricate schemes like this one where even a bankruptcy filing can facilitate a cash windfall for certain players if lawyers and executives can learn to play fast and hard with the rules that insulate them from being caught abusing the process. Bergeron is left with the impression that many lawyers (who typically get paid for their time whether they win or lose) treat the profession like a game rather than a sacred and esteemed occupation where integrity should be priority number 1.

**LEGAL ANALYSIS:**

**I. BERGERON HAS A 6TH AMENDMENT RIGHT TO CONFRONT HIS ACCUSERS AND CROSS EXAMINE THOSE WHO OFFER TESTIMONY AGAINST HIM**

Multiple parties have proffered declaratory statements in support of the instant motion and injunction request. Bergeron has a right to cross-examine any witness against him or ask that the motion be summarily dismissed. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that witnesses must be made available for cross-examination to guarantee the 6th Amendment right to confront one's accuser.

"Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty," Justice Antonin Scalia wrote for the court. "Admitting a statement deemed reliable by a judge is fundamentally at odds with the right of confrontation." Bergeron must therefore be allowed to formally question Attorney Garman, Michael Levy, William J. Bullard, John Villari, and John Lennon at the March 1, 2011 hearing.

**II. BALANCE OF IRREPARABLE HARM FAVORS NO INJUNCTION AGAINST BERGERON'S INVESTIGATION AND LITIGATION EFFORTS**

Even the temporary deprivation of First Amendment rights constitutes irreparable injury, *Citizens for A Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir.1975). Every moment's repression of expression presumptively does the public injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")The Supreme Court has made it clear that any restriction of speech is unconstitutional if it regulates substantially more speech than the Constitution allows to be regulated. See, e.g., *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity"). See also *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987) (invalidating overbroad regulations prohibiting all "First Amendment activities" at airports in Los Angeles); *Houston v. Hill*, 482 U.S.451, 481 (1987) (declaring unconstitutional an overbroad provision making it unlawful to interrupt police officers in the course of their duties); *Schad v. Borough of Mt. Ephraim*,452 U.S. 61, 61-2 (1981) (striking as overbroad an ordinance prohibiting all live entertainment); *Gooding v. Wilson*, 405 U.S. 518 (1972) (invalidating a fighting words statute).

[Before] a prior restraint may be imposed by a judge, even in the interest of assuring a fair trial, there must be "an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately 'imperil.'" *U.S. v. CBS, Inc.*, 497 F. 2d 102 (5th Cir. 1974), quoting from *Craig v. Harney*, 331 U. S.367 (1947). Prior restraints, such as injunctions, are a "'most extraordinary remedy'" to be used "only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive means." *CBS*, 510 U.S. at 1317 (Blackmun, J.,Circuit Justice).

Clarence Darrow, an attorney known far and wide for his revolutionary approach to arguing a case, was once his own lawyer in *The State of California v. Clarence Darrow*. Darrow gave his own closing argument in that matter on May 15, 1912. Here is an excerpt that applies to the instant case:

**"As I have told you, I am tried here because I have given a large part of my life and my services to the cause of the poor and the weak, and because I am in the way of the interests. Those interests**

**would stop my voice—and they have hired many vipers to help them do it. They would stop my voice—my voice, which from the time I was a prattling babe, my father and mother taught me to raise for justice and freedom, and in the cause of the weak and the poor. They would stop my voice with the penitentiary."**

When the United States of America was founded, it represented the most progressive political movement in Western Civilization since the days of the Greek democracies over 2,000 years ago. The movement for revolution was sparked by Thomas Paine, who roused colonists' desire for freedom with his best selling book *Common Sense* and then participated in the Revolution both as an enlisted man and by writing the inspirational series *Crisis*. Paine was the first to suggest the unification of the separate states, and the first to use to term *United States of America.* Paine turned over all the money he received from the sale of his works to the Continental Army to support the cause of the Revolution. After the American Revolution was over Paine went on to France where he then participated in the French Revolution in his lifelong effort to fight for freedom from tyranny. Perhaps more than any other single man, Thomas Paine is responsible for the formation of the United States, for as fellow revolutionary and American president John Adams stated: *"Without the pen of Paine the sword of Washington would have been wielded in vain."*

In holding that the Internet is entitled to the highest level of First Amendment protection, *Reno v. ACLU*, 521 U.S. 844, 868, 870 (1997), the Supreme Court recognized "the unique factors that affect communication in the new and technology-laden medium of the Web," *ACLU v. Reno*, 31 F. Supp. 2d 473, 495 (E.D. Pa. 1999), a medium providing a "vast democratic forum," *Reno v. ACLU,* 521 U.S. at 868, which gives average users an unprecedented ability to join a worldwide discussion and debate on a range of subjects "as diverse as human thought," *id.* at 852, and where anyone "can become a town crier with a voice that resonates farther than it could from any soapbox" and "can become a pamphleteer." *Id.* at 870.

A vigilant press and populous is necessary to adequately police government and corporate excesses. "that the greatest menace to freedom is an inert people; that public discussion is a political duty." *Whitney v. California*, 21, 24 (Brandeis, J. concurring). "It as much his duty to criticize as it is the official's duty to administer." *Sullivan*, 55, 59.

"The Supreme Court has "learned, and continue[d] to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers." *Nebraska Press*, 427 U.S. at 560 (quoting *Tornillo*, 418 U.S. at 259 (White, J., concurring)). It is important that this lesson is not forgotten in this case because "[b]oth the history and language of the First Amendment support the view that the press must be left free to publish news, *whatever the source*, without censorship, injunctions, or prior restraints." *New York Times Co.*, 403 U.S. at 717 (Black, J., concurring)."

"The Supreme Court has also reminded us that "Our liberty depends on the freedom of the press, and that cannot be limited without being lost." *Nebraska Press*, 427 U.S. at 548 (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1943)). Thus, "[r]egardless of how beneficent-sounding the purposes of controlling the press might be," the Court has "remain[ed] intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." *Id.* at 560-61 (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring)).

*Coates v. City of Cincinnati*, 402 U.S. 611,91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), struck down an ordinance which prohibited groups of people from conducting themselves in an "annoying" manner on a public street. The Court held that the First Amendment right of free assembly could not be conditioned upon compliance with a purely subjective standard such as "annoyance." Thus, the mere fact that Bergeron's investigative and publication efforts serve to frustrate certain individuals is no basis for injunctive relief.

**CONCLUSION:**

Justice is *not* a business! Justice is and should be treated as a holy enterprise where truth alone is sought and the Rule of Law is secured for each and every U.S. citizen through the enforcement of due process rules that are blind to money, blind to power, blind to political influence, *and refuse to tolerate corruption of any kind!*

Bergeron's Rule 9011 motion, in amended form, is before the court and has been

held in limbo more than an entire calendar year awaiting a decision by Judge Nakagawa as to whether an evidentiary hearing will be held on the matter. Judge Nakagawa has ruled that if such a hearing is held the nature of such a proceeding would require Bergeron's formal presence, but for all other matters Bergeron has been allowed to appear telephonically by the previous judge.

If one takes the time to compare the allegations in Bergeron's key filings to the liquidation trustee's counsel's allegations in numerous adversary complaints, these pleadings are all strikingly similar in many respects. Bergeron's writings both inside and outside of court proceedings describe the very same chain of events the trustee's counsel has sought relief for and provided evidence of throughout his tenure on this case. Bergeron both met personally with the trustee and is actively volunteering information and evidence that may be helpful to Attorney Backman's outstanding claims.

Backman's efforts to litigate his claims have been recently stonewalled by the refusal of certain parties to submit to discovery requests. Bergeron's intense investigation of the parties responsible for this fraudulent bankruptcy has therefore only served to support the proper adjudication of these proceedings through his recent actions to uncover the truth. The fact remains that Bergeron has not interfered at all with "consummation, implementation or enforcement of any Final Order, this Plan or the Confirmation Order or the Liquidating Trust" as alleged by Attorney Garman. Instead, he's gone above and beyond his own responsibilities as a pro-se representative and provided actionable information and evidence that has been crucial to the Liquidation Trust's own independent investigation of this fraudulent bankruptcy.

Garman's instant motion cites authorities and rules under which he has no personal or subject matter jurisdiction to pursue relief for his or his clients' benefit under the circumstances. He also fails to make a prima facie case for restraining Bergeron's permissible investigative-reporting techniques. Additionally, Garman provides no definitive proof for many of the acts he claims Bergeron must be presumed to be responsible for. Bergeron never threatened Mr. Bullard's children, Bullard himself, Villari, or Garman. He simply let them know that he knew where they resided and hinted that he may show up to "ask questions." Only in the case of Villari did he ever

actually show up in person at a private residence, and he left promptly when told to. Additionally, Bergeron has not made a single CraigsList posting as Garman alleges as a pure assumption on his part.

Much has been made in relation to his 9011 claims of the fact that Bergeron is not a shareholder. Yet, the cited Rule 9011 precedents and legal framework in his pleadings explicitly state no requirement for those he seeks relief for to be "similarly situated." There is no requirement to be in the same class as the most aggrieved victims according to the stipulations of Rule 9011. Instead, Bergeron cites legal analysis that reflects Rule 9011 sanctions can be directed to those who can be shown to be harmed by the vexatious and frivolous conduct giving rise to such a sanctions request. He has also previously cited, though Judge King has apparently not read these citations, precedent cases and legal framework that shows non-parties who do not sign pleadings can also be held culpable for Rule 9011 claims and also be held responsible for the tort of abuse of process both directly and vicariously. Rule 9011 effectively picks up that tort in bankruptcy cases and it is the only way abuse of process can be prosecuted against any party in a bankruptcy scenario.

Given a chance to cross-examine the witnesses who filed declarations in support of the instant motion, Bergeron will illustrate the fact that these individuals are lashing out against him because they are trying to avoid being implicated in corrupt behavior. He will also be able to show that there are only malicious motives behind the instant request that were neither well researched nor thought out before they were brought in haste by Attorney Garman on behalf of his clients.

WHEREFORE: The instant motion should be denied, and Bergeron should be allowed to amend the outstanding sanctions motion to account for the latest activity by Garman and his clients designed solely to silence Bergeron's reporting improperly and prevent his dauntless and altruistic pursuit of the truth behind this fraudulent bankruptcy process.

Dated this 28th day of February, 2011

Richard E. Bergeron

Richard E. Bergeron
PO Box 5212
Weirs Beach, NH 03247
(617) 209-4325
Rich.Bergeron@gmail.com
Attorney Pro-Se