**Richard E. Bergeron III**
**PO Box 5212**
**Weirs Beach, NH 03247**
**Pro-Se**
**Email: Rich.Bergeron@gmail.com**
**617-209-4325**

RECEIVED & FILED
FEB 28 11 49 AM '11
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **In re:**<br><br>**XYIENCE, INCORPORATED,**<br>**A Nevada Corporation,**<br><br>**Debtor.** | **Case No: BK-S-08-10474-MKN**<br>**Chapter 11**<br><br>**Adversary No. 08-1082-MKN** |
| **XYIENCE, INCORPORATED,**<br>**A Nevada Corporation,**<br><br>**Plaintiff.**<br><br>**v.**<br><br>**RICHARD BERGERON, an individual,**<br><br>**Defendant.** | |
| **RICHARD BERGERON, an individual,**<br><br>**Counterclaimant,**<br><br>**v.**<br><br>**XYIENCE INCORPORATED, a Nevada corporation,**<br><br>**Counterdefendant.** | **AFFIDAVIT OF RICHARD E. BERGERON IN SUPPORT OF OPPOSITION OF DEFENDANT AND COUNTERCLAIMANT RICHARD E. BERGERON TO COUNTERDEFENDANT FERTITTA ENTERPRISES' EMERGENCY MOTION FOR PLAN IMPLEMENTATION INJUNCTION**<br><br>**Hearing Date: March 1, 2011**<br>**Time: 11:00 AM** |

**AFFIDAVIT OF RICHARD E. BERGERON IN SUPPORT OF OPPOSITION OF DEFENDANT AND COUNTERCLAIMANT RICHARD E. BERGERON TO COUNTERDEFENDANT FERTITTA ENTERPRISES' EMERGENCY MOTION FOR PLAN IMPLEMENTATION INJUNCTION**

**Richard Edward Bergeron III, being first duly sworn, states as follows:**

1. I am a pro-se representative and have been at all times in these proceedings currently pending as *Xyience, Incorporated vs. Richard Bergeron*, Case #: 08-01082-MKN and currently listed as an adversary proceeding under Debtor Xyience Case #: 08-10474-MKN.

2. I make this affidavit in support of the attached opposition filing.

3. I have personal knowledge of, and I am competent to testify to the facts contained in this Affidavit, except those matters based upon information and belief and, as to such matters, I believe them to be true.

4. On July 18, 2007 Xyience filed this case against me in Clark County District Court with direct intent to silence my investigative reporting of ongoing fraudulent activity at the struggling supplement company.

5. This case has been continued by all legal representatives handling it for the re-organized Xyience without regard for the actual facts and true, altruistic motivations behind my investigative reporting.

6. The first link between Xyience, Incorporated and steroids surfaced in a Sherdog article published on November 2, 2007 when a test of Ultimate Fighting Championship Fighter Sean Sherk's Xyience branded "Xtreme Joint Formula" revealed the presence of 1-androstendione in one of the capsules. The article is attached as exhibit 1.

7. Over the past few months I have personally cultivated inside sources employed by Xyience, LLC doing business under Zyen, LLC and Manzen, LLC.

8. My sources have provided me with a multitude of crucial information and documentation, and I have since revealed only a fraction of what I currently possess that I acquired from this interior assistance.

9. These sources are intimately aware of the company's day to day operations and frequently interact with other employees who have been sent my company-wide emails.

10. These sources insist that the bulk of employees in the Las Vegas headquarters office are sympathetic to my cause and might even cooperate with me if they did not fear being fired for doing so.

11. One of my sources informed me that one particular low-level employee named John Villari is viewed by some within the company as "a cancer" and it is known throughout the office that Villari is involved in steroid use and sales.

12. My sources inform me that Villari has been caught engaging in multiple actions which would have earned a write up or harsh discipline, and possibly even the firing, of any other employee who is not as insulated as Villari seems to be.

13. While researching the steroid allegations against Villari I visited Wanderlei Silva's gym in Las Vegas as well as the former Xyience Training Center, which is now doing business as "Throwdown."

14. During my documented visits to these gyms I did not specifically say to anyone I spoke to that Villari was definitely selling steroids, and I was very careful to explain

to those I interviewed that I was simply making inquiries based on allegations I heard.

15. Due to my inside sources I was able to obtain a clear recording of a January 31st, 2011 conference call held by Xyience President/CEO John Lennon and focusing on my activities related to my investigative reporting on Xyience.

16. During this call Lennon made slanderous statements about me to the entire Xyience staff, including remarks claiming I was on the losing end of the instant litigation.

17. I have yet to be ordered to pay any damage amount, legal fees, or any other costs or fees which would constitute this case as a losing effort on my part, and my recent settlement with the liquidation trustee on the outstanding 9011 request will represent a clear victory when and if it is approved by this court.

18. The instant motion and supporting declarations accuse me of actions I have had no part in, namely CraigsList postings I had nothing to do with and no knowledge of.

19. I am told one of the operating theories of some of the Xyience executives is that I am communicating regularly with a former employee named Willie Marshall and certain employees might be feeding him information to give to me.

20. Mr. Marshall is not an active source of mine, he is not feeding me any second-hand information related to the day to day operations of Xyience, and we are both being blamed by various Xyience employees for certain actions obviously perpetrated by third parties without our knowledge.

21. My sources recently described a meeting held with all current employees at Xyience headquarters on Friday, February 25, 2011 in which everyone was herded into a room with no furniture and lectured about me.

22. During this meeting William J. Bullard, the general manager of Zyen, LLC, told Xyience employees I was a threat to the company, but when one employee asked if they should be worried I might attack them Bullard told the entire assembled staff that I was not a physical threat and from his dealings with me he knew I was not at all violent.

23. At all times I have targeted Xyience executives, my primary purpose is to seek formal interviews or to promote settlement talks by proving I am collecting actionable information and evidence from my sources that will only expose the ongoing corruption when it is eventually published and/or brought to bear as exhibits.

24. I have compiled documentation and recorded evidence of defamation and slander perpetrated against me by President/CEO John Lennon, COO and CFO Mike Levy, and Fertitta Enterprises and Zyen, LLC General Manager William J. Bullard that I plan to make part of a new district court proceeding against the reorganized Xyience and those particular individuals to be filed in the coming weeks.

25. I have never printed any false or unfounded material on any platform I publish through that relates to Xyience and/or company employees, associates, executives or ownership.

26. I take my writing and investigative reporting very seriously and am very aggressive when it comes to holding the perpetrators of this fraudulent bankruptcy accountable for their egregious and tortuous actions to defraud the entire class of 385 shareholders.

27. I have studied intensely in the arts of private investigation, psychological warfare, evidence gathering, intelligence operations, and covert operations.

28. Throughout my involvement in this case I have gone out of my way to assist the Liquidation Trustee's Counsel Jon Backman and provided him with actionable

information and evidence on numerous occasions starting in early February of 2010 when I met Backman in person in Bloomington, Illinois.

29. I provided and continue to provide my assistance to Backman without conditions and with the intent to facilitate justice for all the victims of this fraudulent bankruptcy process.

30. While I cannot discuss the details of the settlement I reached on the 9011 motion with the trustee's counsel, I can confirm that our agreement was not conditioned on any active cooperation on my part.

31. All my cooperation with Backman has been volunteered and unconditional.

32. Exhibit 2, attached hereto, consists of two pertinent selections from adversary complaints filed by Backman against our common opposition in which he levels claims that mirror those reflected both in my pleadings and in my published blogs on Xyience.

33. Exhibit 3, attached hereto, is an email I received from William J. Bullard on the evening of Sunday, February 13, 2011 at 5:08 PM.

34. Among other disrespectful and insulting assumptions made within this email is Bullard's suggestion that he does not at all take my legal actions seriously and shares this outlook with other Xyience executives who see my work to argue the law and the merits as "comic relief."

35. Bullard's email prompted me to call his home after acquiring his personal home telephone number and discovering that residential records showed his two college age children still reside at home with him and his wife.

36. I never went to Bullard's home personally and do not plan to attempt to visit his

home, and I have never threatened him, his wife, or either of his children.

37. My mention of the 385 shareholders and my suggestion that it was time to write a check was an obvious indication that my call was designed to promote the settlement of the case to provide relief to those most damaged by the bankruptcy scheme that was orchestrated and facilitated by Bullard at the behest of Frank Fertitta III and Lorenzo Fertitta.

38. Exhibit 4, attached hereto, is a Boston Globe article written about my father Richard E. Bergeron, Jr. and his investigation into organized crime that was derailed due to a case of deep government corruption and abuse of the FBI's informant program by a rogue agent and some of his superiors.

39. I spent nearly a week before leaving New Hampshire to attend the February 10, 2011 hearing on amending the sanctions motion seeking donations from those listed on the shareholder manifest to provide for the funds I would need to fly to Las Vegas,

40. Upon learning at the hearing that I would no longer be permitted to appear telephonically at future hearings I cancelled my return flight home.

41. I subsequently realized that due to the adverse ruling and the preliminary success of my local investigation efforts I would be better off staying in Las Vegas until this case was over.

42. If I were to return home at any point before this case ends I would not be able to return since it was an intense struggle just to get the funds to get out here in the first place.

43. I do not have any savings or major possessions of any significant value, and my lone bank account is currently overdrafted by 210 dollars.

44. I have no problems or issues with Xyience continuing as an entity, and my actions to uncover and expose the behavior of those corrupt individuals employed by, in an ownership position of, or associated with the company are designed to help the company fully recover from the stigma of bankruptcy and prosper under honest leadership and management.

45. Knowing exactly how my actions effect the day to day operations at Xyience headquarters due to source reports also helps to keep my strategy targeted toward the most culpable individuals involved in the ongoing corruption.

46. My sources have encouraged me on numerous occasions that my work produces genuine results and is of grave concern to those attempting to continue to perpetrate fraud on the company.

47. My sources additionally maintain that those who are not engaging in corruption have repeatedly encouraged management to just get it over with and sit down and submit to an interview with me.

48. If my initial outreach attempt toward John Lennon had been successful, and if other executives had agreed to a formal interview, I would not have had to take the additional steps I did recently to increase the pressure on these individuals who continue to corrupt and abuse the company for their own personal benefit.

49. I sincerely regret that some of my actions resulted in my efforts being misconstrued as threatening, but at the same time I must remind the court that it has taken no direct action to provide for justice through formal legal channels despite overwhelming evidence on the record calling for such action and illustrating how urgent that action is needed to curtail the current abuse.

50. I now plan to permanently relocate to Las Vegas and devote as many hours as possible to furthering my investigation into Xyience for the purposes of present and future legal action as well as my creative efforts to highlight this amazing story of greed, corruption, and fraud.

51. I have been in discussions with film producers, literary agents, and potential financiers for planned documentary efforts during my recent stay here.

52. The now-deceased defendant in the case I have been sanctioned in was also featured recently in a Fox News 11 report out of Los Angeles in which I was interviewed at length for (at the Las Vegas Fox studios) and subsequently featured in.

53. Like this case, I volunteered my legal skills to promote justice in that matter and toiled for over two years for no fee whatsoever to help a book subject of mine fight for her rights to free speech.

54. I am wholeheartedly devoted to spending as much time as possible sorting out this complex case of fraud and deception, and I have promised my adversaries I will fight for the victims of this mess for the rest of my life if that's what it takes.

55. Whether or not I "win" this case in the long run by way of receiving any significant judgment I will still work to set aside a large portion of creative project proceeds to be pooled in a shareholder relief fund for their benefit.

56. The last four years working on this case have taken an incredible toll on me both physically and mentally, and as a result I am distracted from many efforts which would be much more profitable and practical for a writer like me to devote my time to.

57. One of the recent efforts this case is taking my time away from is an effort to memorialize a friend, classmate, and former boxing student of mine killed by an IED in

Iraq in April of 2006.

58. I have also been prevented from doing any meaningful work recently to promote a charity benefit involving an amateur boxing event featuring New York Fire Department Boxing Team members against New England Law Enforcement.

59. My Web-site business and writing career has ground to a halt in recent days and weeks because I have been given no other choice but to use every strategy possible and permissible under the law to promote the settlement of this case.

60. If a settlement or final verdict based on a Rule 9011 hearing held on the existing amended motion do not materialize any time soon I will be forced (due to Judge King's order barring future telephonic appearances) to move permanently to Las Vegas and leave behind my family, friends, and obligations at home until this case is completely over.

Dated this 28th day of February, 2011

Richard E. Bergeron

Richard E. Bergeron
PO Box 5212
Weirs Beach, NH 03247
(617) 209-4325
Rich.Bergeron@gmail.com
Attorney Pro-Se

Subscribed and Sworn to Before Me
This 28th Day of February, 2011

NOTARY PUBLIC

My Commission Expires:
JULY 30, 2012

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
JOHN ACEVES
No: 08-7219-1
My Appointment Expires July 30, 2012

# EXHIBIT 1

SHERDOG

Options: Print | Email | close window

# Few Answers, Many Questions Following Hearing

Friday, November 02, 2007
Josh Gross

LOS ANGELES -- For the second time in three months, the California State Athletic Commission ignored the recommendation of its executive officer by voting to reduce the suspension of a fighter who tested positive for steroids.

While many expected UFC lightweight champion Sean Sherk (Pictures) -- who stood accused of having nandrolone metabolites in his system during a July 7 title defense in Sacramento -- to be the recipient of a shortened sentence, it was middleweight Phil Baroni (Pictures) who walked away eligible to fight at the start of 2008.

At the Junipero Serra State Building on Wednesday in Downtown Los Angeles, commissioner Julio Ramirez capped a long day of hearings marred by a chaotic process when he offered into motion a vote to halve the one-year suspension CSAC executive officer Armando Garcia originally levied against Baroni, all the while keeping a fine of $2,500.

Ramirez, who in August spearheaded the reduced suspension of boxer James Toney from 12 to six months, was one of three commissioners to vote in favor of the motion -- the third called in 10 minutes as the six-member group attempted to find a solution -- while two opted against the measure and another abstained.

Baroni was one of 33 mixed martial artists that California accused of using banned substances between March and September of this year. Following a summer loss to Frank Shamrock (Pictures), he was notified that his urine sample contained anabolic steroid metabolites for boldenone and stanozolol.

Four months later, an impassioned Baroni testified that he had never taken steroids. With manager Ken Pavia leading the charge, Baroni's camp attempted to discredit the findings by Quest Diagnostics, a drug testing group that carries out 10 million tests a year for private employers across the United States and is used by California to monitor fighters.

Showing four separate negative drug tests for anabolic agents, including one Sherdog.com documented July 11 in Las Vegas, Pavia appeared to create doubt amongst the commissioners that his client had intentionally cheated.

Dr. R. H. Barry Sample, the Quest Diagnostics director of science and technology, was one of three experts to give lengthy presentations on steroids before the commencement of Wednesday's hearing. He was brought in from Georgia to testify on the chain of custody and testing procedures of the lab. Baroni put him on the defensive, particularly after the revelation of his final test.

Baroni had asked that the remaining urine from the test conducted by Quest be sent to The Carlson Company, a laboratory located in Colorado Springs, Colo. While it didn't appear among the 40 facilities recommended by the CSAC, Carlson appealed to the fighter as a rare lab that tested for both DNA and steroids.

Proving the urine was free of steroids wasn't enough; Baroni wanted to find out definitively if the sample came from him. Though there wasn't enough of a sample for the lab to determine the identity of its owner, Carlson apparently had enough to determine the sample they received from Quest did not contain boldenone or stanozolol metabolites.

"We don't know why he tested positive with Quest Laboratories in California," said Baroni's manager Ken Pavia. "But we do know that subsequent tests with that sample came back negative."

Karen Chappelle, lead supervising deputy attorney general for California, questioned the credentials of the Colorado lab and picked away at Baroni's first independent test, which occurred before he fought Frank Shamrock (Pictures) and on which his fiancée's name appears as the test taker.

Case 08-10474-mkn Doc 606 Entered 02/28/11 14:18:53 Page 13 of 25

Baroni is eligible to fight in January and should compete on the first Strikeforce card of next year, yet in the wake of the hearing and appeals process, the middleweight said he was "scared to fight [in California]. I never had a problem before. I don't know what precautions I can take because I didn't take those substances I was penalized for.

"My name is always going to have an asterisk as a steroid user and a cheater, and I'm not," Baroni said. "That's why I spent all this money and whatnot, to get my name cleared."

For his part, Sherk is hoping to simply get a fair shake on Nov. 13.

"I was real confident coming in here that the facts would speak for themselves, but after today I'm not so sure now," he said.

Like Baroni, Sherk knows he might have to live with the stigma that comes with being considered a known steroid user.

"I want to clear my name," he said. "I don't want this attached to me. And I want to fight as soon as possible. This is how I make a living. I've got a family. I've got a title -- something I've worked for my whole life, so obviously that's real important to me. Both of them are equally as important."

During his short time in front of the commission, Howard Jacobs, Sherk's counsel who has also represented high-profile drug defendants Floyd Landis and Marion Jones, attempted to deconstruct the chain of custody and establish why Sherk's urine was delivered to Quest three days after it was collected.

Jacobs hammered away at the competence and expertise of CSAC inspectors before learning that a "pre-hearing brief and exhibits" he filed Friday evening had not made its way from Garcia, Chappelle or associate governmental program analyst Bill Douglas to the commissioners.

Garcia said the e-mail sent on Oct. 26 contained a file their office could not open, but he declined to comment further on Wednesday's proceedings. Chappelle, said Jacobs, was the only person to request a hard copy, which she received Tuesday.

"I think this process needs a lot of work," Sherk said. "You've got peoples' lives on the line. Peoples' livelihoods. Things people have worked really hard for."

Chappelle acknowledged that "kinks" in the process was the reason Sherk's hearing had to be postponed to Nov. 13.

"I wanted to jump up and say you're damn right you have some kinks," said Sherk, who said he has paid close to $20,000 in legal fees and lost up to half of a million dollars in fight and sponsorship money while sitting on the sidelines. "They know they have kinks, but they're 100-percent confident in their process, obviously. Whether they have kinks or not, it's my responsibility and my lawyers responsibility to find those kinks and prove to them their process needs work, because even though they say it, it doesn't mean everything."

To that end, Jacobs' pre-hearing brief, a copy of which Sherdog.com obtained, lays down two possibilities for the positive test of nandrolone metabolite. The first comes with the potential of serious testing irregularities by Quest Diagnostics. Jacobs alleges several testing flaws, both in the chain of custody between CSAC and Quest, as well as in testing procedures inside the lab.

During testimony, Dr. Sample stood by the lab's results.

If the commission deems Sherk's sample contained banned substances, Jacobs will argue it could have resulted from the many supplements the Minneapolis-based fighter ingested leading up to the fight.

Seven tests totaling $3,000 were conducted on supplements Sherk took before his bout against Hermes Franca (Pictures). One such product was the Xyience-branded "Xyience Xtreme Joint Formula." Five capsules were analyzed according to a report supplied by Don H. Catlin, M.D., president and CEO of Anti-Doping Research, Inc.

"No anabolic steroids were detected in four of the capsules," Catlin wrote. "In one capsule 1-androstendione was identified."

As for the one capsule of "Xyience Xtreme Joint Formula" in which 1-androstendione was identified, the company said it has halted all shipments of the product until it can conduct independent testing by a certified lab.

"While we are confident that Xyience products do not contain anabolic agents or any illegal substances," said Susan Wierzbicki, Director of Quality Assurance, Xyience, "we are taking this report

very seriously."

Asked if he intended to blame Sherk's positive steroid test on the Xyience product, Jacobs answered, "Not specifically, no."

Jacobs explained that it was only his intention to show over-the-counter supplements can be contaminated.

In this case, the supplement company is a major advertiser for Ultimate Fighting Championship events and just announced a three-year extension with the MMA promoter on Oct. 13; it also sponsored Sherk before the two parted ways over money issues.

In addition to the alleged testing irregularities and potential supplement contamination, Sherk also submitted himself to a polygraph test.

"It's not the central part of the case, but I think it's important given that it's not, in my view, a strict liability standard," Jacobs said. "You have to weigh the evidence. You have one test that's their urine test and you have a polygraph on the other side. If they have to prove he used a drug or administered a drug, the fact that he was found to be truthful when he said he didn't use it should be relevant."

The commission is slated to rule on the admissibility of a polygraph examination within a week.

Having just completed his process with the commission, Baroni said he will watch closely as Sherk's drama plays out.

"I would like to see him get vindicated," Baroni said of the lightweight. "That would almost be like me winning. I know I didn't do it and I believe he didn't do it."

*Sherdog.com reporter Adam Swift contributed to this report*

---

Copyright © 2011, Sherdog.com - All rights reserved.
Monday, February 28, 2011
SHERDOG

# EXHIBIT 2

**Case 10-01079-mkn Doc 5 Entered 02/16/10 07:10:16 Page 10-11 of 17:**

56. On January 23, 2008, and February 12, 2008, at the hearings on approval of the License Agreement, and in papers submitted to the Court, Zuffa Marketing, by itself and through counsel for the Debtor and Zyen, and acting in concert with the latter:

(a) falsely informed the Court that the Debtor could not continue to sell its inventory, and thus would lose some $8.0 million in gross revenue, when in fact the Debtor could have continued to sell all of its inventory through June 17, 2008, well beyond the 75-day term of the proposed License Agreement, and in any event, could have replenished its retailers within several weeks even if could not have continued to use the UFC mark;

(b) falsely advised the Court that the Zuffa Payment came from earmarked funds, and that the earmarking defense would provide an absolute defense to a preference claim, when such clearly was not the case under the settled governing law;

(c) misled the Court as to relationship among Fertitta Enterprises, Zuffa Marketing and Zyen by suggesting that they were only related at a distant corporate level, that they were acting independently in connection with the Debtor, and that they were represented by separate counsel, when in fact the three entities were located in the same building, had worked together and coordinated virtually every aspect of their takeover of the Debtor, and indeed had been represented by the same attorneys throughout the critical October 2007 transactions.

(d) repeatedly insisted that the License Agreement was critical to the Debtor's survival, and of great value to the Debtor, when in fact, the Agreement had little if any legal or financial value to the Debtor;

(e) falsely represented to the Court that Zuffa Marketing did not care one way or the other whether the Court approved the License Agreement, and that Zuffa Marketing would walk away from the Agreement if the Court did not approve it immediately, when Zuffa Marketing knew from its conspiracy with Zyen and Fertitta, and their owners, that Xyience and then New Xyience were going to remain major sponsors of Zuffa Marketing and the UFC during and after the Bankruptcy Case, and that Zuffa Marketing would not have abandoned the License Agreement with or without the releases and other unconscionable provisions;

(f) stated to the Court that the purpose of the License Agreement was to enable the Debtor to maximize its value in seeking an independent purchaser, when in fact the Zyen and Zuffa Marketing already knew who the purchaser would be, as well as the approximate purchase price, and were using the prospect of an independent purchaser exclusively to induce the Court to authorize the License Agreement; and

(g) misrepresented to the Court that the reason Zuffa Marketing was demanding an extraordinarily expedited approval of the License Agreement was to avoid the dilution of

its marks, when Zuffa Marketing knew that no such dilution could or would occur, and that the reason for expediting the process was to obtain the Court's approval before the creditors and shareholders could discover and reveal the true facts.



73. Had the Debtor, from and after May 2007, been pursuing bona fide third party financing, it could have obtained such financing, its sales would have continued to grow and it ultimately would have avoided bankruptcy and survived as solvent and profitable entity.

74. Instead, as direct result of the conduct of the defendants herein, the Debtor was forced into a liquidating Chapter 11 case and left with no assets (other than avoidance actions and related claims) and tens of millions of dollars in unpaid debts.

# EXHIBIT 3

Gmail

Rich Bergeron <rich.bergeron@gmail.com>

# Websites and Results

bill Bullard <bestbeer75@ymail.com>
To: rich.bergeron@gmail.com

Sun, Feb 13, 2011 at 5:08 PM

Sounds like you're getting it from both(many) sides. Your websites seem to be suffering from the same thing your court appearances do - lack of intellect and content. While I've never met or spoke with you, I suspect your not too old to go back to your parents and ask them for help in giving you some guidance in helping you become a contributing young man to both yourself and your community. I'm sure last Thursday was equally embarrassing for you as it was for those of us waiting for our time in front of the judge. You really came across as an amature w little intellect of your claim and the process. If those of us waiting for our time with the judge can say anything, we all thank you for your comic relief.

Perhaps time for a new career?

# EXHIBIT 4

Sign In | Register now Home Delivery The Boston Globe

boston.com

Local Search Site Search

Herb Chambers Mercedes-Benz Locations
2011 Mercedes-Benz C300
Somerville Lynnfield Natick
New England's Mercedes-Benz Sales Leader
Lease For Only $349/mo
CLICK HERE





The Boston Globe

# Mob underling's tale of guns, drugs, fear

Weeks before his death, McIntyre felt 'trapped'

By Dick Lehr
Globe Staff / February 27, 2000

Email | Print | Single Page | Yahoo! Buzz | ShareThis Text size

His body was dug up last month from a makeshift grave in Dorchester, a recovery that answered at long last a question that had haunted family and investigators since his 1984 disappearance: Whatever happened to John L. McIntyre?

Although he had always been presumed dead, no one knew for certain. Now, there are some answers to another part of the mystery - why he was killed.

The questions are answered in McIntyre's own and virtually last words, contained in a transcript obtained by the Globe of a debriefing session with investigators six weeks before his death. In it, McIntyre described the military-style manner in which James J. "Whitey" Bulger ran his criminal enterprise. He talks about marijuana and cocaine smuggling and gives a rich account of the IRA gunrunning operation named after the fishing boat, Valhalla, he worked on and which was used to carry 7 tons of weapons to an IRA trawler.

The transcript also revealed that McIntyre feared for his life and was desperately seeking police help to get free of the mob. "I'd just like to start living a normal life," the 32-year-old said on Oct. 14, 1984. "I just sometimes feel like I'm trapped in this whirlpool and I can't get out of it."

Over time, a vague outline of McIntyre's fate has surfaced publicly - that after he offered to cooperate against Bulger and his sidekick, Stephen "The Rifleman" Flemmi, the gangsters found out and allegedly killed him.

But what a shaken McIntyre actually said during his bid to come in from the cold had never been revealed, and the transcripts provide a chilling glimpse of a man who was in over his head and had had enough of the dark side. "It's almost like living with a knife in you," he said about the underworld. "I didn't start out in life to end up like this, you know."

He was a man turning to the government for help but who, together with the investigators with him that night, was unaware that the strongest arm of the government, the FBI, was deeply entangled in a corrupt alliance with Bulger and Flemmi.

Talking into the tape recorder during the initital debriefing on a Sunday night, McIntyre mentioned Patrick Nee, a Bulger associate; Kevin Weeks, a Bulger underling; and "the one guy above him," a reference to Bulger himself who, if angered, "he'll just put a bullet in [your] head." In all, it was a tense, emotional session.

In yet another chapter in the unholy compact between the Boston FBI and Bulger and Flemmi, a federal grand jury is now probing whether the FBI leaked to the two mobsters, their prized informants, that McIntyre's tell-all talk posed a huge risk to their empire.

ADVERTISEMENT
PROGRESSIVE
GET YOUR FREE QUOTE NOW!

Enter ZIP Code:
Get Your Free Quote

INSIDE BOSTON.COM

RED CARPET AT THE OSCARS

Best Supporting Actress nominee Amy Adams arrived

OSCAR HIGHLIGHTS

Robert Downey Jr. and Jude Law joked on stage

FASHION HITS AND MISSES

Jennifer Hudson's Versace gown dazzled at the Oscars

MAJOR SPORTS TRADES

These trades shook up Boston and the rest of the sports world

PLUS...
Blogs | Crossword | Comics | Horoscopes | Games | Lottery | Caption contest | Today in history

MAKE YOUR VACATION A LANDMARK OCCASION
Complete Tour Packages
from $949


"You don't know where you're going to end up or what kind of demise you're going to come to," McIntyre fretted, words that eerily foreshadow his fate.

It wasn't as if the police that night had McIntyre over a barrel, the usual circumstance for a wise guy who sees talk as the only way out. Instead, McIntyre was just back from weeks at sea on the gunrunning mission when police picked him up outside his estranged wife's home in Quincy.

"They thought I was a burglar, because I rang the doorbell last night and no one answered, so I climbed up the balcony," McIntyre explained. "I mean, I hadn't seen her. I'd been out for six weeks."

McIntyre was no choirboy. He had had his beefs with the law, once after assaulting some youths who had stolen car wheels and equipment from him. Then he was arrested for driving while drunk, and when he failed to show up in court a warrant for his arrest automatically appeared on his file. It amounted to "B.S. beefs," as the police said later during the debriefing, using an acronym for minor complaints. But the outstanding warrant meant McIntyre was held by Quincy police when they picked him up outside his estranged wife's place.

**DEA agents are summoned**

Once at the station, McIntyre voluntarily began talking about marijuana, mother ships, gunrunning, and, most shocking, the Valhalla. His concerns were twofold: He wanted help with his run-in with the local cops and an escape route out of the underworld. The talk, however, went over the heads of the patrol officers, and a call went out for Detective Richard Bergeron.

The Quincy detective then summoned a federal Drug Enforcement Administration agent, Steve Boeri. The Quincy police and DEA had teamed up to investigate Bulger's and Flemmi's drug trafficking, a probe called Operation Beans. The federal agent got quickly to the point:

Boeri: So you want to cooperate with the government?

McIntyre: Yeah. If you can get me out of this jam. See if I can straighten out my life.

Boeri: Okay. Now what are you going to talk about . . . guns or dope?

McIntyre: Drugs.

Indeed he did. The Quincy man described how he worked the docks and the boats for seven marijuana-smuggling trips. "I was the engineer on all those boats," he said, each of which carried, on average, "between two and three thousand bales."

His life, it seemed, had a history of veering suddenly. He had dropped out of college to join the Army and then, after having begun a solid track record in intelligence, was busted for marijuana possession. In the early 1980s, he was working in underwater construction and asbestos removal, and had a small fishing boat when he became involved with Joe Murray of Charlestown, one of the region's biggest drug traffickers. McIntyre belonged to Murray's "cell" in an extremely "structured organization" that was "just like the military." The news McIntyre offered the DEA was that the Murray group had "merged" with "the South Boston organization," information that corroborated the investigators' own surveillance about Bulger's expansion in the early '80s into trafficking by extorting fees from importers.

"They have a liquor store over in South Boston," McIntyre said, referring to the South Boston Liquor Mart that Bulger had taken over in early 1984 to use as a base. "Right at the rotary there. That's their front organization."

McIntyre conceded he had never been inside the liquor mart. "See, you never go outside your chain of communication." Making matters worse, it was hard to

**MOST E-MAILED**

1. Eating up miles, drinking in scenery, motoring from Nice to Tuscany
2. Boston Common set for face lift
3. Young inventor navigates the rocky road to market
4. A madcap quest for 'free'
5. Man shot to death in Hyannis home
6. Top 10 work-at-home jobs and careers
7. Baby causes toddler to reject mom

**RECOMMENDED SEARCHES**

- Weather
- Ski Guide
- Obituaries
- Sudoku
- Horoscope
- Crossword puzzle

ABOUT THIS LIST

know who you knew; the wiseguys often used nicknames and no last names. ("For three years I didn't know Joe Murray's last name.") He did, however, know Bulger's key underlings - Patrick Nee and Kevin Weeks. "They wanted to bring some of their representative people over," he said about the Bulger gang. "So they could keep an eye on everything."

**Dealing with "bad characters"**

Nee, born in Ireland but a longtime Southie figure, was a proud sympathizer of the Irish Republican Army. Weeks, known as Bulger's surrogate son, was described as "a little shorter than me. Husky, stocky, dark hair. He wears a gold chain with boxing gloves. I knew he was a Golden Gloves fighter."

Talking about their bosses, McIntyre said: "I'm telling you, these characters are bad. I don't know what your idea of a bad guy is, but they would tie you right up with piano wire to a pile and leave you there. That's their idea of a joke."

Boeri: This sounds real good. Let me ask you a question. How would you feel about, would you be willing to feed us information about working with these guys?

McIntyre: I'd do it if it would get me out of this.

The freshest thing on McIntyre's mind that night was the IRA gun-smuggling operation. "You don't know what it's like offloading this stuff out at sea," he said, recapping the drama of the gun exchange with the IRA boat, the Marita Ann. "We tore one of the cleats off, we bashed in the side when the Irish boat hit us."

The Valhalla, a 77-foot fishing trawler, had left Gloucester on Sept. 14 for a few weeks of swordfishing. At least that was the cover story. In fact, the trawler was carrying 7 tons of weapons valued at $1 million. Nee, representing Bulger, and Murray were the hands-on organizers, rounding up an arsenal - part stolen, part purchased - that included 70,000 rounds of ammunition, 91 rifles, 8 submachine guns, 13 shotguns, and 51 handguns. Using a fake name, Nee ordered rocket warheads from an Ohio firm and had them delivered to the Columbia Yacht Club in Southie, where he was a member. One of the bulletproof vests in the cache had belonged to Stephen Flemmi's brother, Mike, a Boston police officer. (Mike Flemmi would say later it was stolen.)

Loading the boat was tense and hurried. "Joe Murray brought weapons right up in his Blazer," McIntyre recounted. "We had to bring six vans in and this guy Kevin [Weeks] was there. He was up on the hill watching with the VHF [two-way radio]." Originally, added McIntyre, "We were going to bring coke along with the weapons. . . . Joe couldn't get enough out of Columbia." But the mission was first and foremost about getting guns to the IRA. "We were committed to do the weapons."

The boat carried six men - McIntyre, a captain named Bob Anderson, "an IRA man that we left over there with the load," and three other men from Bulger's gang, who used the names Charlie, Huey, and Jimmy. McIntyre, it turned out, had no use for Bulger's men. "Every day they got to take two, three showers. These guys, running around flossing their teeth, taking showers.

"You can tell them right away. All of them wear scally caps. They got the Adidas jumpsuits and they ain't got a speck of dirt on them. They don't know the first thing about a boat."

Unknown to any of the smugglers, the authorities had been tipped off and the Irish Navy intercepted the Marita Ann before it could return to Ireland. It took two more weeks for the Valhalla to make it back to Boston, tying up at Pier 7.

"They got an informer over there," McIntyre said, guessing what went wrong. "In each county, they [the IRA] have a general. But there was only 10 people in Ireland that knew the deal was coming down." (In the early '90s, the former head of the IRA in Kerry said he was the leak. Sean O'Callaghan, an assassin

turned informer, said he did it for revenge.)

By the time he was finished talking to the DEA, McIntyre had covered drugs, guns, and the inner workings of the Bulger-Murray joint ventures. The investigators felt as if they had won the lottery.

"Seemed like an awful big gift at that particular point in time," Bergeron, the Quincy detective, testified in 1998 during federal court hearings examining Bulger's ties to the FBI. The feeling was almost euphoric, having an asset like McIntyre for Operation Beans. "This guy had a mountain of information," Bergeron testified.

But, Bergeron recalled, McIntyre was also clearly "petrified of these guys," leading Boeri to test his resolve. "Are you going to play ball with us?" the DEA agent asked. "Like tomorrow or the next day? Are we going to be able to talk to you more or are you going to have a change of heart?"

"You get this thing squared away for me," McIntyre replied firmly, "and like I say, I'd like to straighten my life out."

McIntyre kept his word.

The DEA, however, shared the "gift" of McIntyre with other law enforcement agencies, including a compromised FBI. The next day, McIntyre repeated what he had said to agent Roderick Kennedy of the FBI's Boston office. In Operation Beans, Kennedy was serving as a liaison between the bureau and the DEA/Quincy police. In an FBI report filed about his Oct. 16, 1984, interview, Kennedy wrote that McIntyre went over the drug and gun smuggling, talked at length about Joe Murray, and also talked about "Patrick Nee of South Boston, Kevin, and an individual named Whitey who operates a liquor store."

**Drug shipment seized**

To show he was the real thing, McIntyre mentioned a drug shipment coming into Boston aboard the freighter Ramsland. The boat was seized as it entered Boston Harbor on Nov. 16, 1984, and 36 tons of marijuana were found buried in the hold.

But within weeks of what had seemed a huge break for the DEA and Quincy investigators, McIntyre left his parents' home saying he was going to meet with Nee. He was never seen again. His truck was found in early December in the lot of a Dorchester lounge. His wallet and an uncashed veteran's disability check were on the dashboard. In an instant, John L. McIntyre, the man hoping to turn his life around, had vanished.

Until mid-January of this year. Police were led to the sensational recovery of McIntyre's remains and those of two others by Kevin Weeks, who, facing racketeering charges after his indictment in late 1999, has turned against his mentor, Bulger. Though still not identified, the other remains are believed to be those of safecracker Arthur "Bucky" Barrett, missing since 1983, and Deborah Hussey, a girlfriend of Flemmi's, who also disappeared during fall 1984.

Last week, Boeri did not return telephone calls. Bergeron and Kennedy declined to comment. In 1985, however, not long after McIntyre's disappearance, Operation Beans crashed. It turned out that the FBI - and, in particular, FBI agent John Connolly - had secretly protected the two crime bosses. "Connolly contributed to assuring that DEA's efforts would not succeed by alerting Bulger and Flemmi to the investigation generally and to the electronic surveillance particularly," US District Court Judge Mark Wolf wrote in a 661-page ruling in the federal racketeering case pending against Flemmi and the fugitive Bulger.

Eventually Murray, Nee, and others were convicted for drug smuggling and gunrunning, but Bulger and Flemmi were never charged in those cases. The exact responsibility for McIntyre's murder, meanwhile, remains unfinished business. In his ruling, Wolf complained that key documents - the transcript of

McIntyre's initial debriefing that is the basis for this story, and then Kennedy's FBI reports about McIntyre - were not produced by the government in time to thoroughly question Kennedy and others.

"There is circumstantial evidence to suggest that Kennedy may have told Connolly about McIntyre's cooperation . . . and reason to be concerned that Connolly may have told Bulger and Flemmi," concluded Wolf in September 1999. Now, a federal grand jury is investigating a possible link between the FBI and the murder.

Kennedy appeared before the panel last summer, sources told the Globe last autumn. The retired FBI agent, sources said, insists he never told Connolly about McIntyre but that Connolly knew anyway because Connolly was around when agents were discussing McIntyre's cooperation. In interviews, Connolly, who was indicted in December on racketeering charges, has denied telling Bulger and Flemmi about McIntyre.

McIntyre's family, meanwhile, awaits possession of John's remains. The family is planning a cremation and memorial service at Star of the Sea Church in the Squantum section of Quincy.

"I'd like to be able to sleep at night," was the way McIntyre put it to explain why he wanted to cooperate - words that today are like a voice from the grave but were in fact a call for help made on an otherwise forgettable night 16 years ago. ■

© Copyright 2008 Globe Newspaper Company.

Email | Print | Single page | Reprints | Share

Your Name

Your e-mail address
(for return address purposes)

E-mail address of recipients
(separate multiple addresses with commas)

Name and both e-mail fields are required.

Message (optional)

Send

DISCLAIMER: *Boston.com does not share this information or keep it permanently, as it is for the sole purpose of sending this one time e-mail.*

Ads by Google what's this?

**Security Guard Service**
Professional Service, Protection, Investigation - Serving NJ, PA, DE
www.spisecurityservices.com

**Awareness Training**
Confidently put threats in check. Corporate, Government, Private
www.escapethewolf.com

Home | Today's Globe | News | Business | Sports | Lifestyle | A&E | Things to Do | Travel | Cars | Jobs | Homes | Local Search

CONTACT BOSTON.COM | Help | Advertise | Work here | Privacy Policy | Newsletters | Mobile | RSS feeds | Make Boston.com your homepage

CONTACT THE BOSTON GLOBE | Subscribe | Manage your subscription | Advertise | The Boston Globe Extras | The Boston Globe Store | © 2011 NY Times Co.